14506

PINKUSSOHN v. GREAT ATLANTIC & PACIFIC TEA CO.

(192 S. E., 283)

April, 1936.

*Mr. Robert McC. Figg, Jr.,* for appellant, cites:

*Mr. Edwin J. Blank,* for respondent, cites:

June 30, 1937.

The opinion of the Court was delivered by MR. CHIEF JUSTICE STABLER.

It appears that the defendant company owns and operates a grocery store at 332 King Street, City of Charleston; and that on June 9, 1934, about 11:30 a. m., the plaintiff, while there shopping, was painfully and seriously injured. She then brought this action against the company for the recovery of damages in the sum of $25,000.00.

The complaint alleged, among other things, "that the defendant, its servants and agents, had placed an electric display sign in its window facing King Street, and in order to supply electric current to this sign, said defendant, its servants and agents, carelessly, negligently, recklessly and wantonly ran electrically charged wires from an electric overhead ceiling light to said sign, without properly insulating the same, or otherwise protecting the plaintiff, where said electrically charged wires were connected above the counter; so as to leave at the place of connection, what is commonly known as exposed live wires; and without protecting its customers, of which the plaintiff was a part, by throwing proper safeguards around these exposed live wires, so as to prevent injuring the plaintiff, or apprising her in any manner of this danger. That to the contrary, said exposed live wires were left charged and dangling, where same were connected over its display counter in the front of its said store, where fruits and vegetables were placed by the defendant for sale; and where plaintiff, as a part of the public, was accustomed and invited by the defendant to shop; and while the plaintiff was then and there shopping as a customer of the defendant, and

while her back was turned to said electrically charged exposed live wires, so that she did not and could not see them; she was severely and permanently injured, by the back of her left arm coming in contact with said unprotected dangling exposed live wires, causing her to sustain violent electric shocks. * * * That by reason of said electric shocks, the plaintiff thereafter suffered, and still continues to suffer, violent and agonizing pains, by vertebra displacements, shock, mental anguish and nervous disorders, which have confined her almost continuously to her home from the time of the accident to this date."

It was further alleged that the injuries complained of were caused by the negligence and wantonness of the defendant in the following particulars: In altering, enlarging, and changing the electric installation of its wires as above described, without first notifying the city electrician and obtaining his written permit therefor, in violation of Section 284 of the city ordinances; in using the current as above set forth, over its altered and additional wires, without first notifying the city electrician, so that the wiring and appliances could be first inspected by him and approved before use, as provided by Section 285 of the ordinances of the City of Charleston; "in allowing and permitting an unlicensed and inexperienced person or clerk to wire said hook-up"; in not affording plaintiff with a safe and suitable place in which to shop within its store, and in permitting "exposed live wires to remain at points of their connection where the plaintiff and public was accustomed and invited to buy."

The defendant, answering, admitted that the company "had an electric display sign in its window, and supplied electric current thereto from an electric overhead ceiling light"; and that, on information and belief, the plaintiff was in its store at the time alleged in the complaint. It denied, however, that the injuries sustained by her were caused by any negligence or wantonness on its part. The defense of contributory negligence was also pleaded.

The trial of the case, in April, 1936, resulted in a verdict for the plaintiff for $12,500.00 actual damages. A motion for a new trial was refused by Judge Rice, and this appeal followed.

Counsel for the appellant states and argues five questions, the first of which is whether the trial Judge erred "in admitting in evidence and ruling applicable to the facts of this case ordinances relating solely to the wiring of buildings." The ordinances referred to are as follows:

"Section 284. No alteration shall be made in the wiring of any building for light or power, nor shall any building be wired for electric lights, motors or heating devices without a permit therefor from the City Electrician, nor shall any change be made in any electrical installation after inspection without notification to the City Electrician and his written permit therefor."

"Section 285. Upon the completion of the wiring of any building for light, heat or power it shall be the duty of the company, firm or individual doing the same to notify the City Electrician, who shall then inspect such wiring and appliances, and if approved by him he shall issue a certificate of satisfactory inspection which shall contain the date of such inspection and an outline of the result of his examination, but no such certificate shall be issued unless such wiring and appliances be in strict conformity to the rules and regulations prescribed or required by these ordinances, nor shall current be turned on such installation until such certificate be issued."

As to what was done in putting up the electric display beer sign in the window of defendant's store, there was testimony to the effect that the connection made was not that of a fixture to a socket already installed in the building as a part of the wiring thereof; but that one set of wiring was connected to and ran from an overhead ceiling fixture toward the display sign, and that another set was attached to such sign and ran in the direction of the overhead ceiling fixture, under

the fruits and vegetables on the counter so as to be hidden from view, and emerged therefrom about the height of the plaintiff's elbow from the floor, where they were spliced with the wire running from and connected with the ceiling fixture. At this point the wires were allowed to remain uninsulated, and when the current was turned on to light the electric display sign in the window, live wires at the uninsulated places were exposed, and they were kept from short-circuiting—coming in contact with one another—by a little piece of wood placed between them.

D. G. Boyd, a clerk in the defendant's store, testified that he put the electric display beer sign in the window; that the piece of wire leading from the sign was only about six feet long; that he put a wire in the overhead drop light coming down, which he connected with the wire from the sign by splicing them together, and at the point where they were spliced about two inches of the wire were left uninsulated; and that there was no baseboard socket there that he could attach it to.

J. E. Mellard, a witness for the plaintiff, stated that he was inspector of electric works for the City of Charleston; that permits were required for putting in any kind of sign, where the wiring is different from the mere plugging in as a fixture; that to plug in the beer sign, if the wires were properly rubber covered, would not be additional work, as that would be a fixture; but when the wires are "spliced or hitched together" as in this case, that is additional work, a change in the electrical installation, and for that reason would require a permit to be done.

We think, from a reading of the ordinances in the light of the testimony above quoted, that they were intended to apply, among other things, to such a case as the one before us. In other words, to prevent just what was here done by the defendant, except when done in the manner provided by the sections named. The Court, therefore, committed no error as complained of. In addition, we may

say that it was the duty of the company, aside from the city ordinances cited and quoted, to exercise due care in the circumstances, the failure of which to do constituted negligence and rendered it liable for injuries to any one resulting therefrom. Under the pleadings and the proof, including the sworn statements of defendant's servants as to what they did and failed to do, we think the jury was amply justified in awarding damages as they did without reference to the ordinances admitted in evidence. Furthermore, while we have decided this question on its merits, the exceptions which raise it do not at all meet the requirements of Section 6 of Rule 4 of this Court, and for that reason alone consideration of them might have been properly refused.

The second question presented for decision is whether the Court was in error in its instructions to the jury as to damages recoverable for future suffering of the plaintiff. The charge complained of, which the appellant contends permitted speculative damages to be included in the verdict, was as follows:

"It is for you to say whether the amount asked for is the amount she ought to have, or whatever amount less than that, that you think will compensate her for being hurt, if she is hurt, and whatever suffering she has undergone, and whatever suffering you think she will undergo in the future; that depends on whether you think the injuries are permanent."

In *Green v. Catawba Power Co.,* 75 S. C., 102, 55 S. E., 125, 126, 9 Ann. Cas., 1050, where the question of damages from future suffering was considered, the Court said:

"The second exception charges error in this instruction to the jury: 'If you find for the plaintiff, then you can take into consideration these elements of damages * * * his physical and mental pain and suffering, and that which he is liable to endure in the future by reason of his injury.'

"The word 'liable,' in such a connection, signifies something that might happen without importing reasonable cer-

tainty that it would happen, and, therefore, the charge indicated the jury might enter into the field of conjecture as to possible future suffering and injury. The instruction in such cases should be that the verdict may include not future damages which the plaintiff is liable to suffer—that is, may suffer—but such damages as it is reasonably certain will of necessity result in the future from the injury."

In *Lockhart Power Co. v. Askew*, 110 S. C., 449, 96 S. E., 685, 686, where the trial Judge charged the jury that they could "consider and award such damages as is actually inflicted upon the owner of the land by the construction of the dam, including any special damages that might arise," this Court held that the words "might arise" being used without such qualifying words "as a matter of necessity," as was done in another portion of the charge, "the jury were thereby permitted to include special damages that were mere possibilities." See, also, *Brewer v. Northwestern Railway Co.*, 151 S. C., 415, 149 S. E., 124.

In the case at bar, the following was a part of the instructions given by the trial Judge on the question of damages:

"If she has suffered any pain and injury, why, you give her whatever amount you think will compensate her for her pain and suffering. This is the last chance she is going to have; whatever verdict you write now is final, and you can, therefore, take into consideration whether or not her injuries are permanent. If you are satisfied that they are permanent, then actual damages, of course, will be fixed by you on that basis, because, as I said just now, the defendant admits liability for negligence."

It is seen that the Court told the jury, in the first place, that their verdict would be final, and for that reason they could take into consideration whether or not the injuries of the plaintiff were permanent; and if they were satisfied that her injuries were of such a nature, they would fix actual damages on that basis; he then told them, in close connection therewith, that any award for suffering that she might un-

dergo in the future would depend upon "whether you think the injuries are permanent." When the charge is thus considered and analyzed, it seems clear that there was a substantial compliance with the rule stated in the *Green case.* The complaint made with reference to the use of the word "think" by the trial Judge, that he thereby permitted the jury to speculate as to whether or not the plaintiff's injuries were permanent, is without merit. Such instruction, as has been held, can be as well understood by the jury as if the word "believe" or "find" had been used instead.

The trial Judge is also charged with error "in allowing plaintiff's counsel, over objection, to prove that the defendant did not offer 'this poor lady' financial assistance," the contention being that the only purpose and result of the evidence thus elicited was to prejudice the jury.

When the witness, Henderson, the manager of the store, was on the stand, plaintiff's counsel asked him this question: "What financial assistance did you or your company render Mrs. Pinkussohn?" Objection thereto, on the ground that "what happened afterwards is incompetent," was overruled by the Court, and the witness answered that he had "no authority for that; the superintendent looks after that." Sohl, the company's superintendent, was asked a similar question, which was objected to on the same ground. Judge Rice, however, permitted the question, and the witness answered that "we didn't offer any financial assistance; we did what we could."

While this testimony was irrelevant to the issue of negligence, it appears that the appellant is not in any position to complain, as similar evidence had previously been brought out by its counsel on cross examination of the plaintiff, that subsequent to the accident the defendant endeavored to render her assistance:

"Q. You also don't know that the hospital was phoned and the services of a physician tendered for you? A. No, sir; they said no one inquired about me."

On redirect examination of the plaintiff by her counsel, she testified that the money spent by her on her trips—referring to the trips taken by her to regain her health—was for her own expenses. The following question was then asked and answer made without objection:

"Q. Has the Atlantic & Pacific Tea Company offered to help in any way? A. No, sir; it has been almost two years, and they have never even inquired about me."

The exception raising this question is overruled.

As the fourth question involved, the trial Court is ■■ charged with error in permitting plaintiff, through her counsel, to ask her own witness leading questions on a vital issue, and in overruling the objections of the defendant thereto.

When Dr. Boylston, a witness for the plaintiff, was on the stand, he testified that he had made two $x$-ray pictures of the lower part of plaintiff's neck, and "I found that the top vertebra in the cervical region misplaced to the right quite badly. Also the fifth lumbar vertebra was badly misplaced"; and that this could easily have happened when she had the accident about which she was complaining. On cross examination, he stated that he did not see how an electric shock could cause any vertebra displacement; and conceded that it was possible that the displacement did not occur at the time of the shock, if the plaintiff did not fall; but that he "wouldn't say it did or didn't." Then, on redirect examination by plaintiff's counsel, the following occurred:

"Q. Doctor, while an electric shock would not cause displacement itself, a sudden jerk or jolt from the electric shock would, wouldn't it?

"Mr. Figg: Your Honor, that is leading.

"The Court: I will let him answer the question; he is an expert on these things.

"Q. Doctor, while, ordinarily, an electric shock would not cause a displacement of the vertebra, a sudden jolt or fall by reason of the electric shock would cause it, wouldn't it?

"Mr. Figg: Your Honor, that is leading.

"Q. Would it, or not?

"The Court: It is in the discretion of the court, and I will let him answer.

"A. A sudden jerk or jolt from it can produce it, yes."

Counsel for appellant argues that what was here allowed to be done was calculated, in the circumstances stated, to "prejudice seriously defendant's rights, on a crucial and vital issue affecting the injuries claimed and the verdict gotten"; and that the trial Judge abused his discretion in permitting these questions to be asked, as he execised it on an erroneous conception of the law, to wit, that the witness was "an expert on these things." The respondent contends that the "further pursuit or limitation of this line of testimony was a matter strictly within the discretion of the presiding Judge."

We do not think there was prejudicial error as contended. While it is true that the trial Judge did say that the witness "is an expert on these things," he finally permitted the question to be answered on the ground that it was in his discretion to do so; and we cannot say, in view of all that happened, that there was such an abuse of discretion as amounted to manifest error of law. Certainly, the appellant cannot complain about the testimony itself, as somewhat similar evidence was elicited from other witnesses without objection. Dr. Buist testified as follows:

"Q. Doctor, don't you think, as a result of the electric shock, she is suffering from traumatic neurosis? A. I think she is.

"Q. Don't you think the fall after the shock is partly responsible for her condition? A. Yes, sir."

The plaintiff herself, when asked to describe to the jury just what she did when she received the shock, stated:

"I came in the store, and there was a clerk weighing bananas, and there was a gentleman being waited on. I stood right here (indicating) to get my bananas. I noticed three or

four soft ones on the bunch, and I reached back to lay them down there (indicating), and I got this shock. I had this terribly funny feeling. The stiffness came, and my head went back like this (indicating), and I fell back.

"Q. In other words, your back was thrown out of alignment before you fell? A. Yes, sir."

But even if there was error in permitting the questions to be asked, we think it was harmless, as the defendant's counsel, in his argument to the jury, admitted liability of the company for simple negligence and such actual damages to the plaintiff as proximately resulted therefrom. For these reasons, the exception raising this question is held to be without merit.

Counsel for the appellant states his fifth question as follows:

"Was there error in commenting about one of plaintiff's witnesses before the jury that he 'is an expert on these things, thereby enhancing the weight and effect of his evidence on a crucial and vital issue of injury and damage?"

What we have said in our consideration of Question four applies to some extent here. In addition, we think that the trial Judge might properly have ruled, if the question had been raised, that the testimony of Dr. Boylston qualified him as an expert as to the matters testified to by him. However, no such issue was made, as defendant's objection to the questions asked was rested entirely on the ground that such questions were leading. It appears, therefore, that this remark of the Court made in connection with his ruling on defendant's objection as stated, may properly be regarded as merely an isolated statement.

In *State v. Anderson,* 181 S. C., 527, 188 S. E., 186, 191, complaint was made "of the language of the trial Judge in his reference to the affidavits of the fathers of appellants when passing on the motion, based on these affidavits, to commit appellants to the State Hospital." Mr. Justice Baker, in holding that this was not ground for reversal, said: "If

counsel for appellants felt that their clients' defense had been prejudiced, they should have then and there called it to the attention of the Court to the end that such prejudice or ill effects could have been removed  *  *  *  it would indeed be remarkable if some isolated statement falling from the lips of the Judge could not, with some plausibility, be claimed as prejudicial to one side or the other.  *  *  *  If appellants felt that the remarks of the Judge in passing on the motion to commit them were prejudicial, then an opportunity to remove the alleged harm was again open by submitting an appropriate request to charge."

We think, upon full consideration of this question, that the exception raising it is without substantial merit and should be overruled.

The judgment of the Circuit Court is affirmed.

Messrs. Justices Carter, Bonham, Baker and Fishburne concur.