## BICKLEY v. UNITED STATES.

Civ. A. No. 1802.

District Court, E. D. South Carolina,
Columbia Division.

April 28, 1948.

---

George Bell Timmerman and R. Milo Smith, both of Lexington, S. C., for plaintiff.

Ben Scott Whaley, U. S. Atty., of Charleston, S. C. and Russell D. Miller, Asst. U. S. Atty., of Bennettsville, S. C., for defendant.

WYCHE, District Judge.

This action was commenced on July 31, 1947, to recover damages for injuries to person and property under the Federal Tort Claims Act, 28 U.S.C.A. § 921 et seq. This claim arose out of a collision at about 8:30 a. m. on August 2, 1946, at a junction of State highways 6 and 43, near and north of the city limits of Lexington, South Carolina, between a 1942 Ford Coach owned and operated by the plaintiff, and a 1942 Army Chevrolet Coach owned by the defendant, and operated by one of its civilian employees who was acting within the scope of his employment. The Court viewed the scene of the collision and the approaches to it with the consent and in the presence of counsel for both parties on March 23, 1948, the date of the hearing in this matter.

I find the facts specially and state separately my conclusions of law in the above cause as follows:

### Findings of Fact

The plaintiff, Cora Wessinger Bickley, a widow, then fifty-six years old, and in good health, approached the junction of highway 43 and highway 6 from the south in her automobile along the right side of a straight and level section of highway 6, which was of concrete construction, while proceeding by way of said highway from Lexington to her home in Chapin, South Carolina.

The army automobile approached the junction from the east along a winding section of highway 43 which was of tar and gravel construction and which first curved toward the north, then crossed the brow of a hill and went down grade and into a curve toward the south until it entered highway 6 at an angle of about 45 degrees and thence merged with highway 6 as it continued southward in a direction opposite to that traveled by the plaintiff.

At or slightly south of the junction, the army automobile, of size and weight comparable to plaintiff's automobile ran almost "head-on" against the front of the plaintiff's automobile with such force that it knocked the plaintiff's automobile around toward the west and back in the direction from whence it had come for a distance of 12 feet and 6 or 8 inches by actual measurement.

The skid-marks on the concrete highway, over which the plaintiff's automobile approached the junction, showed that her automobile was on the right side of highway 6 and that it traveled forward only a few feet after the brakes were applied.

The skid-marks on the tar and gravel highway, over which the army automobile approached the junction, and the skid-marks on the concrete highway, over which it traveled after reaching the junction, showed that after the brakes were applied the army automobile skidded, by actual measurement, for a distance of 123 feet in the direction in which it was traveling, 12 feet and 6 or 8 inches of which occurred after the impact.

The speed of the plaintiff's automobile was estimated to be between 25 and 30 miles an hour as it approached the junction. The brakes on her automobile were in good working condition. She arrived near the junction first, saw the army automobile when it was approaching at an estimated distance of a city block from

the junction, or about as far as she could see around the curve in highway 43 along which the army automobile was traveling, and, because of the apparent high speed of the army automobile, she immediately applied brakes, stopping her automobile within the space of a few feet, instead of attempting to pass the junction before the army automobile arrived there.

The driver of the army automobile estimated his speed at 50 miles an hour as he traveled west along the winding tar and gravel highway until he crossed the brow of the hill and saw the curve in the highway toward the south, at which time, he estimated that he reduced speed to 40 miles an hour. He saw the plaintiff's automobile when he was at an estimated 250 feet from the junction, and he estimated that he applied his brakes when he was 75 or more feet from the junction.

Another government employee, who was a passenger in the army automobile, estimated its speed at between 40 and 45 miles an hour when the driver applied the brakes; but he was reluctant to make this estimate and testified in explanation that he had been reading up to the time the brakes were applied.

In view of the physical facts above stated, these estimates of the speed of the army automobile were most conservative.

The wheels on the army vehicle locked when the brakes were applied and failed to respond to the steering wheel causing the driver to lose control over the automobile and showing that either the brakes, the steering mechanism, or both, on the army automobile were defective.

The highways were wet at the scene and time of the collision. The army automobile passed through several showers in traveling from Columbia, South Carolina, to the junction, a distance of about 12 miles.

The driver of the army automobile, as he approached the junction from the east on highway 43, could see ahead of him the curve to the south in the highway and the junction of this highway and highway 6 for a distance of about one-half of a mile before reaching the junction, as measured and testified to by the State Highway Patrolman from Columbia who investigated the accident, and within ample time to have reduced the speed of the army car to a safe speed before attempting to enter highway 6.

He could also see an old large, two-story, frame dwelling house, which was so situated on the west side of highway 6 and on the side opposite to his approach to the junction as to attract the junction to the attention of motorists approaching along the same route within ample time to reduce speed to a safe speed before attempting to enter highway 6.

He could further see as he approached the junction that the terrain lying to his right obscured his view of any motorists who might be traveling toward the junction from the north on highway 6 and meeting the plaintiff along highway 6 until he and said motorists were both very near the junction and that it would be dangerous not to reduce his speed so that he could stop the army automobile before entering highway 6 if circumstances should require it.

There was also a side road or alternate route which branched off to the right and north of highway 43, along which the army vehicle was traveling, toward an alternate junction with highway 6 for the use of any motorists who might wish to enter highway 6 in a northerly direction.

The junction in question and the alternate junction were indicated to motorists approaching from the east along highway 43, as did the army vehicle, by a highway sign painted in black on a yellow background consisting of a black "Y" shaped perpendicular figure, both arms of which intersected with a straight black horizontal line painted across the top of the "Y", the extremeties of which horizontal line extended beyond the width of the "Y". The left arm of the "Y", its perpendicular stem, and the horizontal line were of equal width, the stem and left arm of the "Y" indicating highway 43 and the horizontal line indicating highway 6. The right arm of the "Y" was slightly narrower than the other lines and indicated the side road or alternate route. This sign gave a complete picture or chart of the type junc-

tion which lay ahead, and showed clearly to approaching motorists that highway 43 curved toward the south and entered a straight north and south highway at an angle of about 45 degrees and merged with it as it continued south and that there was a side road or alternate route branching toward the north until it entered and merged with said north and south highway as it continued north.

The junction was indicated to motorists approaching from the south along highway 6, the route taken by the plaintiff, by a highway sign painted in black on a yellow background, consisting of a black perpendicular line with a black line curving toward the right and east from the approximate center of the perpendicular line, thus indicating that ahead highway 6 continued straight to and beyond the junction and that highway 43 curved off to the right and east at the junction.

These signs were of the standard type used in this State to indicate to motorists the nature of highway conditions lying ahead and were so located about 500 feet from the junction as to give timely warning of the junction and its character so that speed could be reduced to a safe speed before reaching the junction.

The plaintiff's automobile approached the junction of the two highways well ahead of the army automobile, that is to say, when the plaintiff's vehicle was only a short distance from the junction the army automobile was much farther away, well over 200 feet and perhaps more than three or four hundred feet; and, but for the fact that the plaintiff was driving slowly and put on brakes immediately when she saw the speed at which the army automobile was approaching, the accident could have resulted in consequences even more serious than did occur.

Since the plaintiff saw the army automobile approximately a city block before it reached the junction and since the driver of the army automobile admitted seeing the plaintiff's car coming up to the junction when he was still a distance of 250 feet from the junction, it appears that if the army car had been traveling at a reasonable rate of speed it reasonably could have been brought to a stop or under safe control so as to have avoided the collision and its consequences.

From the foregoing, it appears that the driver of the army vehicle approached the junction of the two highways at an unreasonably high, negligent and dangerous rate of speed and that such conduct was the direct and proximate cause of the collision and the consequent personal injuries to plaintiff and the damage to her property.

The evidence does not warrant the inference that plaintiff was guilty of any negligence which contributed as a proximate cause to the collision or to her injuries and damages. The evidence shows that she was traveling on the right side of highway 6 at a reasonable rate of speed, much below the speed allowed by law, and that she did all that a reasonably prudent person would have done to avoid the collision.

The plaintiff received very painful and serious injuries at the time of the collision which can be summarized as follows: (a) A condition of shock so grievous that a necessary operation was delayed for that reason for three days, (b) An injury to the lower part of her back, (c) An injury to her right wrist, (d) An injury to her upper abdomen and lower chest, the latter of which necessitated the use of a spinal anesthetic at the time of the operation, (e) A simple fracture of her right patella (knee cap), and (f) A compound comminuted fracture of the left patella with extensive compound wound into the knee joint and a tearing of the capsule and quadriceps tendon; and these injuries were accompanied by considerable bleeding, hysteria, such intense pain that opiates were given four or five times a day for several weeks, and a danger of blood poison which required giving large doses of penicillin for several weeks.

The plaintiff was in a hospital from August 2, 1946, until September 6, 1946, and was confined to her bed at her home for two additional weeks. She, thereafter, walked with crutches for several months, and used a cane after the crutches were discarded until about Christmas, 1947. She

was under the care of her physician, a reputable and capable orthopedic surgeon, from August 2, 1946, until around March 18, 1948.

A reconstructive operation was performed on the plaintiff's left knee on August 5, 1946, and a considerable portion of the patella was removed and the capsule and quadriceps tendons were sutured. A plaster cast was applied to both legs from the toes to the groin; and the plaintiff remained in one cast for about four weeks and in the other cast for about eight weeks.

The plaintiff now suffers and will continue to suffer with traumatic arthritis which is extensive in the left region and which will become increasingly worse as she becomes older, which, in that event, will require further medical treatment. Her arthritis causes discomfort and pain from time to time and especially during weather changes and on damp or cold days.

The plaintiff has a fifty per cent. permanent loss of function of her left leg manifest by roughening of the knee joint, limitation of motion, and atrophy of the thigh. There have been definite arthritic changes in the left knee and there is a rather rough knee joint which is indicative of post-traumatic arthritis. There is a generalized tenderness about the entire left knee joint, increased fluid within the joint, and definite grating within the joint which is revealed by active motion. Any attempt to increase motion in the knee beyond ninety degrees causes rather severe pain; and a moderate amount of activity causes pain and swelling.

The plaintiff has a ten per cent. permanent loss of function of the right leg manifest by limitation of motion and some roughening within the knee joint. There is minimal evidence of arthritic change in this knee joint. The right knee reveals mild tenderness on pressure. Movement of the right knee cap reveals some crepitation. Active motion of the knee reveals very definite grating.

The plaintiff has a fifteen per cent. permanent loss of function of her back due to limitation of motion, tenderness in the lumbosacral joint, and changes in this part of the spine. Twisting movements of the back are painful. The lower part of the back gets stiff at times and it is difficult to straighten up. There is evidence of arthritis and very definite tenderness at the lumbosacral joint.

The plaintiff has at least a forty per cent. total permanent loss of function of the body as a whole.

In addition, the plaintiff experiences rather constant discomfort in her chest which increases with weather changes and pressure over the anterior and anteromedial chest wall causes discomfort. She suffers occasional discomfort in her right hand; and she walks with and will continue through her life to walk with a noticeable limp. This limp is much worse after inactivity. When she first arises from a sitting position, she has a very noticeable limp and it is apparent that it is an effort for her to extend her legs completely and start walking.

As the plaintiff grows older her arthritis will cause her increased disability and her pain and suffering will increase.

The injuries, which the plaintiff received, prevented her from performing any kind of work from the time of the collision on August 2, 1946, until April, 1947.

The permanent injuries which the plaintiff received will always handicap her especially in attempting to walk, climb up and down stairs, rise from a sitting position, and in attempting to engage in any activities such as stooping, squatting, stepping up and down and over obstacles and any others involving the use and movement of her legs, knee joints and lower back, all of which would be required in performing domestic duties in and about a home.

The plaintiff, who is a widow, owns, with her son, her home, and she has no means of support or income other than what she can earn from her own labors. At the time of her injuries, she was fifty-six years old and prior thereto had supported herself by operating a small chicken farm, maintaining a vegetable garden, and doing sewing for others on a mechanical machine at her home. While the extent of her earnings beyond a livelihood for herself were small, the extent of her permanent in-

juries will prevent her from engaging in these activities and from performing customary domestic and household duties, such as cooking and keeping house in her rural home, and, therefore, will necessitate employing others to do this work for her if it is to be done. At present, the plaintiff is employed as a switch-board operator.

The plaintiff's doctor bill was $250, her hospital bill was $267.50, and the measure of the damage to her automobile was $334.22, or a total for these items of $851.72 as stipulated by counsel for the parties.

By reason of plaintiff's personal injuries, pain and suffering, and loss of time and income, as distinguished from her property damage and expenses for medical treatment, she has been damaged in the sum of $12,750.

## Conclusions of Law

■ This Court has jurisdiction of the parties and of the subject matter of this action.

The collision was not caused nor contributed to by negligence of the plaintiff.

The defendant's employee while operating defendant's automobile within the scope of his employment was guilty of actionable negligence which was the direct, proximate and efficient cause of the injuries to plaintiff's person and property and of the resultant expense which she necessarily incurred.

The negligence of defendant's employee was such that the defendant, if it had been a private person, would be liable to the plaintiff under the law of South Carolina where the accident occurred.

■ The law of South Carolina, under which this case has been tried, makes one who negligently injures another liable for compensatory damages "in proportion to the character and extent of the injury, and such as will fairly and adequately compensate the injured party". Sullivan v. Charleston & W. C. Railway Co., 85 S.C. 532, 67 S.E. 905, 906. In determining the amount of compensation for personal injuries, it is proper to take into considera-

tion the physical and mental pain and suffering endured, the expense incured for necessary medical treatment, the loss of time and income which result, the impairment of the ability to work and earn a livelihood, and the character of the injury and the amount that would make the injured party whole as respects the permanent injuries. Sullivan v. Charleston & W. C. Railway Co., supra; Bussey v. Charleston & W. C. Railway Co., 52 S.C. 438, 30 S.E. 477; Campbell v. Hall, 210 S.C. 423, 43 S. E.2d 129, 132. And, in addition thereto, it is proper to take into consideration such "pain and suffering as it is reasonably certain will of necessity, result in the future from the injury". Campbell v. Hall, supra; Pinkussohn v. Great Atlantic & Pacific Tea Co., 184 S.C. 171, 192 S.E. 283; Green v. Catawba Power Co., 75 S.C. 102, 55 S.E. 125, 9 Ann.Cas. 1050; Ford v. A. A. A. Highway Express, Inc., et al., 204 S.C. 433, 29 S.E.2d 760.

■ The plaintiff is entitled to recover for the damage to her automobile in the amount stipulated, $334.22.

The plaintiff is entitled to recover for her medical expenses in the amount stipulated for her hospital bill, $267.50 and in the amount stipulated for her doctor bill, $250, being a total of $517.50 for her medical expenses.

The plaintiff is entitled to recover for her other elements of personal injury the sum of $12,750.

Defendant is not entitled to recover its counterclaim.

Based upon the foregoing findings of fact and conclusions of law, I am of the opinion that the plaintiff should have judgment against the defendant for her property damage the sum of $334.22 and for her personal injuries, including pain and suffering, loss of time and income, and expenses for medical treatment the sum of $13,267.50, in the total sum of $13,601.72.

Counsel may submit proposed order for the entry of appropriate judgment accordingly.